## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| Clarence Snyder,<br>607 South 4th Street<br>Lebanon, PA  17042 | : <br> : <br> : |
| | : |
|     Plaintiff, | : |
| | : |
|       v. | : |
| | :    Civil Action No.  _____ |
| Tyson Foods, Inc.<br>403 S. Custer Avenue<br>New Holland, PA  17557 | : <br> :    Electronically Filed<br> : <br> :    JURY TRIAL DEMANDED |
| | : |
| and | : |
| | : |
| Eva Rivera, Individually | : |
| | : |
| and | : |
| | : |
| Albert Gonzalez, Individually | : |
| | : |
| and | : |
| | : |
| Todd Shultz, Individually | : |
| | : |
|     Defendants | : |

## COMPLAINT FOR DECLARATORY AND MONETARY RELIEF

Plaintiff, Clarence Snyder, claims damages upon a cause of action against the above-captioned Defendants, collectively and individually, whereof the following is a statement:

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, as a case arising under the laws of the United States. Jurisdiction is invoked pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2611 *et seq.,* which provides for original jurisdiction of Mr. Snyder's claims arising under the laws the United States and over actions to recover damages and to secure equitable and other relief under the appropriate governing statutes.

2.     This Court has jurisdiction over Mr. Snyder's state claims pursuant to its supplemental jurisdiction as codified at 28 U.S.C. § 1367.

3.     Mr. Snyder has exhausted all administrative remedies and has taken all other steps necessary to bring this action before this Court.

## VENUE

4.     Paragraphs 1 through 3 are incorporated herein by reference as though set forth in full.

5.     The actions complained of herein occurred within the jurisdiction of this Court and involve a Defendant who resides within its jurisdictional limits.

6.     Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and 1391(c) because one or more of the defendants can be found

in the Middle District of Pennsylvania and events or omissions giving rise to Plaintiff's claims have occurred in the Middle District of Pennsylvania.

## PARTIES

7. Paragraphs 1 through 6 are incorporated herein by reference as though set forth in full.

8. Plaintiff, Clarence Snyder (hereinafter "Mr. Snyder"), is a man over the age of 40 with a disability and serious health condition currently residing at 607 South 4th Street, Lebanon, PA  17042.  Mr. Snyder was successfully employed as a Full-Time Maintenance Mechanic with Defendants for over 5 years until he was illegally fired after suffering a workers' compensation injury, using FMLA leave, and helping a disabled co-worker access an inaccessible time clock.

9. Defendant Tyson Foods, Inc. (hereinafter "Defendant Tyson"), is a Pennsylvania corporation with a place of business at 403 S. Custer Avenue, New Holland, PA  17557 and engages in commerce throughout Pennsylvania and the United States.  It employs over 50 employees, controlled the terms, conditions, and privileges of Mr. Snyder's employment, and is an employer pursuant to the Family and Medical Leave Act.  At all times relevant hereto, Defendant Tyson is engaged in

commerce or in any industry or activity affecting commerce and employs in excess of 50 employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. Defendant is thus an Employer as defined by the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, is liable for Plaintiff's damages, and is responsible for the acts of its supervisory employees, owners, and its board members.

10. Defendant Eva Rivera (hereinafter "Defendant Rivera"), is employed with Defendant Tyson in the human resources department.   At times relevant hereto, Defendant Rivera had supervisory authority over Plaintiff, including control of Mr. Snyder's terms, conditions, and privileges of employment.   She is being sued in her individual capacity. An "employer" for purposes of the FMLA includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." According to the FMLA's regulations, "[a]n 'employer' includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees . . . Individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA".   Because Defendant Rivera acts and acted, directly or indirectly,

on behalf of Defendant to its employees, she is an employer for purposes of the FMLA and is individually liable for Plaintiff's damages. Additionally, Defendants are responsible for the acts of its supervisory employees, including Defendant Rivera.

11. Defendant Albert Gonzales (hereinafter "Defendant Gonzales"), is employed as the Director of Human Resources with Defendant Tyson. At times relevant hereto, Defendant Gonzales had supervisory authority over Plaintiff, including control of Mr. Snyder's terms, conditions, and privileges of employment. He is being sued in his individual capacity. An "employer" for purposes of the FMLA includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." According to the FMLA's regulations, "[a]n 'employer' includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees . . . Individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA". Because Defendant Gonzales acts and acted, directly or indirectly, on behalf of Defendant to its employees, he is an employer for purposes of the FMLA and is individually liable for Plaintiff's damages.

Additionally, Defendants are responsible for the acts of its supervisory employees, including Defendant Gonzales.

12. Defendant Todd Shultz (hereinafter "Defendant Shultz"), is employed as the Personnel Manager with Defendant Tyson.  At times relevant hereto, Defendant Shultz had supervisory authority over Plaintiff, including control of Mr. Snyder's terms, conditions, and privileges of employment. He is being sued in his individual capacity.  An "employer" for purposes of the FMLA includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." According to the FMLA's regulations, "[a]n 'employer' includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees . . .  . Individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA".  Because Defendant Shultz acts and acted, directly or indirectly, on behalf of Defendant to its employees, he is an employer for purposes of the FMLA and is individually liable for Plaintiff's damages.  Additionally, Defendants are responsible for the acts of its supervisory employees, including Defendant Shultz.

## **FACTUAL ALLEGATIONS**

13.    Paragraphs 1 through 12 are incorporated herein by reference as though set forth in full.

14.    Plaintiff, Clarence Snyder, is a man over 40 (date of birth 5/5/51) who was employed with Defendants as a Full-Time Maintenance Mechanic from January 20, 2003 until he was illegally terminated on or about June 2, 2009.

15.    In his position as Maintenance Mechanic, Mr. Snyder maintained production and other related equipment typically on the second shift, which was from 3:00 p.m. to 11:30 p.m.

16.    Mr. Snyder suffers from an actual and/or perceived disability and serious health condition of which Defendants were aware.

17.    In the Spring of 2009, Mr. Snyder used FMLA leave to care for his own serious health condition and/or disabilities and he suffered a workers' compensation injury to his shoulder and had restrictions of which Defendants were aware.

18.    Prior to Mr. Snyder's workers' compensation injury, he never received a suspension or disciplinary action.  However, after suffering his workers' compensation injury and work restrictions, Defendants engaged in an intentional campaign to get rid of Mr. Snyder.

19.    On or about April 22, 2009, he was placed on restricted duty, with a 20 pound restriction on his right arm of which Defendants were aware.

20.    On or about April 28, 2009, Mr. Snyder saw Defendants' nurse in reference to his left arm, and she placed him on restrictions for his left arm.

21.    Shortly thereafter, on May 3, 2009, Defendants called Mr. Snyder into a meeting and gave him a "write-up", which Mr. Snyder contested.

22.    At that May 3, 2009 meeting, Defendants, and specifically Todd Schultz, stated that Mr. Snyder had tried to open a claim on his left shoulder for an injury and Tyson's not going to continue to pay for his health problems.

23.    On or about May 7, 2009, Mr. Snyder was given a five pound restriction on his right arm, of which Defendants were aware

24.    Defendants then transferred Mr. Snyder to another department.

25.    Again, on May 28, 2009, Mr. Snyder was called into another meeting and given unwarranted discipline, this time a three day suspending pending investigation for punching the time card for Ronald Weir, who was a disabled co-worker of Mr. Snyder.

26.    At Defendants' New Holland building where Mr. Snyder was employed, the Maintenance Department was located on the ground floor.

27. The time clocks were located on the first floor, or the main level.

28. The time clocks were not on the same floor as the maintenance department.

29. Defendants' employees who enter the building at the ground level must use the stairs to get to the time clock.

30. Defendant has an elevator, but it's only a freight elevator and employees are not permitted to use the freight elevator to access the time clock.

31. Defendant only ever offered one employee to use the elevator, and that was for an employee who has to crawl out of his car and through the parking lot to access his wheelchair that is maintained at Tyson.

32. All other employees had to use the stairs to get to the time clock.

33. The reason Defendant would not allow employees to use the elevator was because it would have tied up all of its work and would have caused an issue.

34. It was common practice for members of the maintenance department to clock in and out for other co-workers.

35. Mr. Snyder's supervisor was aware of this pattern and practice in the department, and the supervisor himself also engaged in this practice.

36. A few weeks prior to being terminated, Mr. Snyder punched in for another employee, Ronald Weir, who was unable to climb the stairs to the time clock because his knees were not functioning properly.

37. Mr. Snyder and other Defendants' employees, including the supervisors in the Maintenance Department, knew that Mr. Weir could not stand for long periods of time because his knees were so bad.

38. The head of maintenance was present when Mr. Snyder punched Mr. Weir in and out, and he never said anything to Mr. Snyder about being in violation of the employer's policy.

39. Additionally, Mr. Weir was present at work when Mr. Snyder punched him in and out.

40. Mr. Snyder did not believe he was intentionally violating any of the Defendants' rules or policies particularly given it was common practice in the Maintenance Department to clock in and out for other employees.

41. Furthermore, Mr. Snyder believed he was doing a good deed when he helped Mr. Weir, who was disabled.

42. On June 2, 2009, Defendants terminated Mr. Snyder and articulated the reason that he was fired because he punched Mr. Weir's time card.

43. According to the Defendants' termination record, "Clarence is being terminated for company policy, which clearly states that falsification of

the timecards clocking in or out for any team member is grounds for termination of employment."

44. The only other employee who was terminated was Ron Weir, who has a disability.

45. Mr. Snyder's supervisor, who allowed Maintenance Department employees, including Mr. Snyder, to punch in and out for Mr. Weir, was not fired as Mr. Snyder was.  He was, however, slightly disciplined, for failing to discipline his employees who fail to punch out.

46. In the Spring of 2009, Mr. Snyder suffered an injury to his arm.

47. Defendants were aware of Mr. Snyder's injury and his medical restrictions.

48. Prior to Mr. Snyder's termination, Defendants were aware of his workers' compensation claim.

49. Prior to Mr. Snyder's termination, Defendants were aware that Terry Slodki—the direct supervisor of both Mr. Snyder and Mr. Weir--was punching in for Mr. Weir every day.

50. Mr. Slodki was not terminated and still works for Defendant Tyson.

51. After being illegally terminated, Mr. Snyder appealed his termination to the alternative dispute resolution committee of Defendants.

52.   Defendant Gonzales who was present at the ADR grievance, testified that
      Mr. Snyder explained that "he thought Mr. Weir was disabled and he was
      assisting a person that was disabled and he also stated that he believed
      this was a conduct that had been taken – going on for years."

53.   At the grievance, Terry Slodki, Mr. Snyder's direct supervisor, stated that
      punching in and out for other employees was permitted.

54.   Furthermore, the Defendant admitted it had no indication that when Mr.
      Snyder clocked Mr. Weir in that Mr. Weir wasn't actually physically
      present in the building and there was no punching taking place when Mr.
      Weir was absent from work.

55.   Despite this evidence of failure to accommodate a disabled person and
      despite the evidence of a long-standing pattern and practice, the ADR
      committee denied Mr. Snyder's grievance and upheld his termination.

56.   After being illegally terminated, Mr. Snyder applied for unemployment
      compensation benefits and was found eligible.

57.   Defendants contested Mr. Snyder's eligibility for benefits, claiming that
      he engaged in "willful misconduct".

58.   After a hearing in which Defendant testified, it was concluded that Mr.
      Snyder did not engage in willful misconduct and was eligible for ,
      concluding that:

Claimant credibly testified that he believe he was doing a good deed by helping his co-worker punch in and out because the co-worker could not reach the time clock on a higher floor because of the co-worker's bad knees.  Further, the Claimant credibly testified that it was past pattern and practice within the maintenance department for employees to swipe co-workers' time cards.  It is also important to note that there is no evidence in the record to suggest that the Claimant used Weir's time card when Weir was not in the building and supposed to be working.  There is no evidence in the record to show that the employer suffered any adverse effects from Claimant's good intentions.

59.   Subsequently, Defendant appealed the unemployment compensation referee's decision to the Unemployment Compensation Board of Review, which denied the employer's appeal, concluding that Mr. Snyder did not engage in willful misconduct for his "laudable" actions.

60.   Furthermore, Defendants refused to provide Mr. Snyder with a COBRA notice or the appeal forms, claiming that he engaged in "gross misconduct."

61.   After firing Mr. Snyder, Defendants claimed that Mr. Snyder was not qualified for COBRA because of "gross misconduct", which is wholly unsupported (as evidenced by Mr. Snyder's successful unemployment hearing in which the Referee found he did not engage in willful misconduct).

62.   Defendants' action in terminating Mr. Snyder's health insurance— particularly where they knew of Mr. Snyder's on-going serious health

conditions, need for consistent medical treatment and medications is egregious.

63. After being denied the continuation of his health benefits through Defendants' willful violation of federal law, Mr. Snyder has been unable to secure necessary and life-saving medical care and treatment and has incurred significant out of pocket expenses for medications and treatment.

64. Additionally, by claiming (without justification) that Mr. Snyder was fired for gross misconduct, Defendants did not have to contribute 65% to Mr. Snyder's COBRA cost. items were missing, and most were damaged beyond repair.

65. Defendants' adverse actions against him were taken in whole or in part because Mr. Snyder is a man over 40, had a workers' compensation claim and injuries, was on FMLA leave, was a qualified individual with a disability or Defendants viewed him as a person with a disability, for which they refused to accommodate, or both and also in retaliation for Mr. Snyder asserting his rights under federal and state law.

66. Defendants' actions and violations of the FMLA were wanton, willful and malicious and have caused severe damage to Mr. Snyder's long-time

career, his ability to support himself and his family, and have negatively

impacted his health.

## COUNT I

### Willful Interference With and Retaliation in
### Violation of the Family and Medical Leave Act

*Against All Defendants*
*Collectively and Individually*

67.     Paragraphs 1 through 66 are incorporated herein by reference as though

set forth in full.

68.     Mr. Snyder was at all times relevant hereto an eligible employee as

defined by the Family and Medical Leave Act.

69.     Defendant Tyson at times relevant hereto was an "employer" as defined

by the Family and Medical Leave Act.

70.     Defendant Eva Rivera at times relevant hereto was an "employer" as

defined by the Family and Medical Leave Act.

71.     Defendant Gonzales at times relevant hereto was an "employer" as

defined by the Family and Medical Leave Act.

72.     Defendant Shultz at times relevant hereto was an "employer" as defined

by the Family and Medical Leave Act.

73.     During his employment and prior to his termination, Mr. Snyder was

eligible for FMLA leave, which was medically necessary to care for his

own serious health conditions as defined by the Family and Medical Leave Act.

74. As more fully outlined throughout this Complaint, Defendants negatively affected the terms, conditions, and privileges of Mr. Snyder's employment instead of providing Mr. Snyder with his right to take 12 weeks of FMLA leave to care for his own serious health condition.

75. Defendants' violations of the FMLA were wanton, willful and malicious.

76. As a result of Defendant's willful violations of the FMLA, Mr. Snyder has suffered damages, including loss of reputation, loss of pay and benefits, loss of future income and growth opportunities, damage to his career, loss of happiness and well-being, and other emotional distress and compensatory damages.

77. Defendants engaged in the retaliatory conduct as fully set forth above and incorporated herein by reference with malice and/or intentional indifference to Plaintiff's statutory civil rights protected by federal law.

78. As a direct and proximate result of Defendant's actions and omissions, Plaintiff has suffered and will continue to suffer loss of employment, lost wages, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

79. The acts complained of were extreme and outrageous, and were engaged in with malice and/or reckless indifference to Plaintiff's well being, thereby entitling him to liquidated damages.

80. Thus, Defendants willfully violated the Family and Medical Leave Act when they interfered with and retaliated against Mr. Snyder for exercising his rights to receive FMLA leave to care for his own serious health condition.

## COUNT II

### Willful Violations of the
### Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the American Recovery and Reinvestment Act of 2009

*Against All Defendants*
*Collectively and Individually*

81. Paragraphs 1 through 80 are incorporated herein by reference as though set forth in full.

82. Defendants terminated Mr. Snyder's employment on or after June 2, 2009.

83. Mr. Snyder was on intermittent FMLA leave when Defendants terminated his employment.

84. During Mr. Snyder's employment, he earned health care benefits through Defendant Tyson's employer-sponsored health plan.

85.   Mr. Snyder was a qualified beneficiary for purposes of COBRA and the American Recovery and Reinvestment Act of 2009 ("ARRA").

86.   Defendant Tyson has 20 or more employees in the prior year and sponsors a group health plan and is subject to COBRA and the American Recovery and Reinvestment Act of 2009.

87.   Mr. Snyder was an "assistance eligible individual" and his involuntary termination on or after June 2, 2009 was a qualifying event for purposes of COBRA and the American Recovery and Reinvestment Act.

88.   Defendants willingly and intentionally failed to provide Mr. Snyder with notices required by the American Recovery and Reinvestment Act.

89.   Defendants asserted that Mr. Snyder's termination was due to gross misconduct and therefore he was not entitled to COBRA coverage upon his termination.

90.   As more fully outlined herein, Mr. Snyder did not commit gross misconduct and his termination did not meet the high burden to justify a "gross misconduct" determination for purposes of COBRA coverage denial.

91.   Defendants never gave Mr. Snyder the right to appeal the determination by the plan administrator.

92.   Defendants never provided Mr. Snyder with a "notice of unavailability of COBRA coverage", which is in violation of COBRA.

93.   Furthermore, Defendants never provided Mr. Snyder with a notice of denial of treatment as an Assistance Eligible Individual and therefore Mr. Snyder had no appeal remedy, which is in violation of the ARRA.

94.   Defendants failed to prove that Mr. Snyder's termination was the result of willful misconduct.

95.   Defendants lost the appeal of the unemployment compensation determination finding no willful misconduct existed to support Mr. Snyder's termination.

96.   Defendants have no credible evidence to support their assertion that Mr. Snyder's termination was due to gross misconduct to justify the denial of Mr. Snyder's COBRA rights and consequently the denial of his rights under the ARRA.

97.   But for Defendants' acts and omissions and violations of the American Recovery and Reinvestment Act of 2009 and COBRA, Mr. Snyder was an "Assistance Eligible Individual." As an Assistance Eligible Individual, Mr. Snyder should have been eligible for COBRA coverage and eligible to receive a 65 percent subsidy for his COBRA premium pursuant to the ARRA.

98.   As such, Defendants willfully, wantonly, and maliciously violated the ARRA and COBRA and are liable for Mr. Snyder's damages, including but not limited to a penalty of $110 per day from the date of Mr. Snyder's termination.

## COUNT III

## WRONGFUL DISCHARGE

99.   Plaintiff restates and realleges paragraphs 1 through 98 above as though fully stated herein.

100.  Mr. Snyder filed for and received workers' compensation benefits in shortly before his termination in 2009.

101.  Defendants discharged Mr. Snyder in June 2009.

102.  Defendants' discharge of, and discrimination against Mr. Snyder, was in retaliation for his filing a workers' compensation claim and receiving workers' compensation benefits in 2009.

103.  Defendants' discharge of Mr. Snyder in retaliation for his filing a workers' compensation claim under 77 P.S. § 1 was a wrongful discharge in violation of public policy and they are liable to Mr. Snyder for all available damages, including attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Snyder, respectfully requests that this Court enter judgment in his favor and against the Defendants and direct the following relief:

1.   For a declaratory judgment against Defendants and in favor of Mr. Snyder;

2.   For a money judgment representing nominal compensatory damages, including loss wages, and all other sums of money, including retirement benefits and other employment benefits, together with interest thereon;

3.   For a money judgment for compensatory damages for creating, permitting, and continuing retaliation and discrimination against Mr. Snyder, including compensation for the distress that arises from being the target and victim of unlawful discriminatory and retaliatory conduct;

4.   For a money judgment representing liquidated damages for the Defendants' willful violation of the Family and Medical Leave Act and any related statutes regulations, and rights;

5.   For a money judgment representing prejudgment interest;

6.   For an Order directing Defendants to restore Mr. Snyder to his position and retroactively promote him with back pay and benefits;

7.   For an Order directing Defendants pay relief to Mr. Snyder in the form of front pay for those wages and benefits he would be receiving if he had not been improperly demoted and fired;

8.   That the Court retain jurisdiction over this action until the Defendants have fully complied with the Orders of this Court and that the Court require Defendants to file such reports as may be necessary to supervise such compliance;

9.   For the costs of suit, including an award of reasonable attorneys' fees;

10.  Award to Mr. Snyder past and future damages for loss of income, growth opportunities, and all benefits denied to him due to the improper and unlawful actions of the Defendants;

11.  Fine Defendants for their violations of state and federal law;

12.  Assess penalties against Defendants of $110 per day from June 2, 2009 for their violations of COBRA and the AARA;

13.  For such other and further relief as may be just and proper, including all relief afforded to victims of discrimination and retaliation for being subject to workplace discrimination, harassment, retaliation, and a hostile work environment.

JURY TRIAL DEMANDED

Respectfully submitted,

_____/s/ Lisa Matukaitis__
Lisa Matukaitis, Esq.
PA BAR ID # 202467
MATUKAITIS LAW LLC
211 State Street, Suite 100
Harrisburg, PA  17101
 (717) 412-7759
lm@matlawllc.com
www.matlawllc.com

Dated:  November 30, 2009